IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TIMOTHY L. BLAKE,          )
                                )
      Plaintiff,         )
                                )
v.                         )  CIVIL ACTION NO. 11-00672-N
                                )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,  )
                                )
      Defendant.      )

ORDER

Plaintiff Timothy L. Blake ("Blake") filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that he was not entitled to child insurance benefits based on disability ("child DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-433 and 1381-1383c, respectively. Pursuant to the consent of the parties (doc. 25), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73.  *See* Doc. 27.

The matter came on for oral arguments on October 11, 2012, at which James J. Dailey appeared for the plaintiff and Assistant United States Attorney Patricia Beyer represented the Commissioner.  Upon consideration of the administrative record (doc.15),

the parties' respective briefs (Docs. 19, 21)[1], and the parties' respective oral arguments at the hearing, the undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

I.     Procedural History.

On March 3, 2008, Blake filed his applications for child DIB and SSI benefits, alleging disability since September 1, 1991, due to problems with "cystic fibrosis, stomach and pancreatitis" (Tr. 83, *see also* Tr. 134, 141, and 154).  The applications were denied on June 26, 2008 (Tr. 78, 83).  Blake timely requested a hearing before an Administrative Law Judge ("ALJ") on August 26, 2008.  (Tr. 90).  Following a hearing on December 14, 2009 (Tr. 30-61), the ALJ entered an unfavorable decision on January 6, 2010 (Tr. 19-29).

Blake filed a request on March 4, 2010, for a review of the ALJ's decision by the Appeals Council ("AP").  (Tr. 13)  Blake's counsel filed a brief with the AP on July 28, 2011 (Tr. 241– 274 and 275-283) and attached thereto two "new" exhibits (Tr. 284-288)[2]. The first of these new exhibits is a letter dated May 5, 2009, addressed "To Whom It May Concern" from Dr. Tung Tran, which states:

> Mr. Timothy Blake (DOB 2/3/1982) has been under my care since February 2009 and has a lifelong history of cystic fibrosis (CF).  His disease is currently managed on multiple medications and while he is currently stable, he will have continued CF exacerbations throughout his lifetime that may

---

[1] Plaintiff's counsel also filed a "Post Hearing Brief" (doc. 28) which was also reviewed by the Court.

[2] Blake did not argue that the ALJ should have considered the evidence presented in these "new" exhibits but, instead, asserted that the ALJ's decision "is contrary to the weight of all the evidence ***now*** in the record."  (Tr. 260, emphasis added).

> be completely disabling and limit his ability to perform physically
> demanding activities.  Please feel free to contact me for any further
> questions.

(Tr. 285).  The second exhibit presented to the AP by Blake  is a letter dated July 27,

2011, from Dr. Brian Fouty and reports the results of pulmonary function testing

performed the preceding day, including "an $FEV_1$ of 1.30 L which is 32% of predicted."

(Tr. 286).  The Appeals Council denied review of the ALJ's decision on September 29,

2011 (Tr. 1-3)[3], making the ALJ's decision the final administrative decision for purposes

of judicial review.  *See* 20 C.F.R. §§ 404.981, 416.1481.[4]

II.    Issue on Appeal.

Whether the ALJ properly evaluated Blake's cystic fibrosis and associated

impairments?[5]  Specifically, did the ALJ err in failing to conclude that Blake was

disabled under Listing 3.04?[6]

---

[3] The Appeals Council found that the additional evidence proffered by Blake "did not provide a basis for changing the [ALJ's] decision."  (Tr. 2).

[4] All references to the Code of Federal Regulations (C.F.R.) are to the 2011 edition.  Subsequent citations are to part 404, which addresses child DIB, and have parallel citations in part 416 which addresses SSI claims under Title XVI of the Act.

[5] Blake specifically contends that the ALJ "failed to review [his] claim of cystic fibrosis under 3.04 of the Listings of Impairments."  (Doc. 19 at 3).  According to Blake, "[t]he pulmonary manifestations of cystic fibrosis should be evaluated under 3.04 of the Listings of Impairments" and, in this case, "[t]he ALJ/Commissioner . . . evaluated [plaintiff's] cystic fibrosis under 4.0 and 5.0 of the Listings which disregarded the plaintiff's respiratory problems."  (Doc. 19 at 4).  Blake further contends that the ALJ erred because only the "non-pulmonary aspects of cystic fibrosis should be evaluated under the digestive body system [analysis discussed in] 5.00 of the Listings of Impairments."  (Doc. 19 at  4).

[6] Although Blake presents his "claims on appeal" in three separate paragraphs, the substance of his claim is that the ALJ failed to evaluate him under Listing 3.04.  *See* n. 5, *supra*.

III.     Standard of Review.

    A.     Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. <u>Barron v. Sullivan</u>, 924 F.2d 227, 230 (11th Cir. 1991).

B.   <u>Statutory and Regulatory Framework.</u>

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. <u>Patterson v. Bowen</u>, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental

impairment" is one that "results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation

process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§

404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include

the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific
impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[7]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next
question, or, on steps three and five, to a finding of disability. A negative
answer to any question, other than step three, leads to a determination of
"not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012

WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1

(M.D. Ala. Jan. 17, 2012).

---

[7] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id.* at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. *Id.* at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

C.    Cystic Fibrosis.

Under the Social Security regulatory scheme, cystic fibrosis is described as " a disorder that affects either the respiratory or digestive body systems or both and is responsible for a wide and variable spectrum of clinical manifestations and complications." 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 3.0(D).  The regulations expressly require that:

> The pulmonary manifestations of [cystic fibrosis] should be evaluated under 3.04. The nonpulmonary aspects of cystic fibrosis should be evaluated under the digestive body system (5.00). Because cystic fibrosis

may involve the respiratory and digestive body systems, the combined effects of the involvement of these body systems must be considered in case adjudication.

*Id.*   Listing 3.04 requires a claimant to show:

A. An FEV$_1$ [forced expiratory volume] equal to or less than the appropriate value in table IV[8] corresponding to the claimant's height without shoes;

or

B. Episodes of bronchitis or pneumonia with hemoptysis [coughing up blood – more than blood-streaked sputum] or respiratory failure (documented according to 3.00C), requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization lasting more than 24 hours counts as two episodes, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of episodes;

or

C. Persistent pulmonary infection accompanied by superimposed, recurrent symptomatic episodes of increased bacterial infection occurring at least once every 6 months and requiring intravenous or nebulization antimicrobial therapy.

---

[8] Table IV referenced in § 3.04 provides:

Table IV
(Applicable only for evaluation under 3.04A--cystic fibrosis)

| Height without shoes (centimeters) | Height without shoes (inches) | FEV$_1$ equal to or less than (L, BTPS) |
|---|---|---|
| 154 or less | 60 or less | 1.45 |
| 155-159 | 61-62 | 1.55 |
| 160-164 | 63-64 | 1.65 |
| 165-169 | 65-66 | 1.75 |
| 170-174 | 67-68 | 1.85 |
| 175-179 | 69-70 | 1.95 |
| 180 or more | 71 or more | 2.05 |

20 C.F.R. pt. 404, subpt. P, app. 1 § 3.04.

20 C.F.R. pt. 404, subpt. P, app. 1 § 3.04.  The regulations also provide that "[s]ome disorders, such as bronchiectasis, cystic fibrosis, and asthma, can be associated with intermittent exacerbations of such frequency and intensity that they produce a disabling impairment, even when pulmonary function during periods of relative clinical stability is relatively well-maintained."  20 C.F.R. pt. 404, subpt. P, app. 1 § 3.00(A).  The regulations also caution that:

> In some situations, most typically with a diagnosis of diffuse interstitial fibrosis . . ., an impairment may be underestimated on the basis of spirometry alone. More sophisticated pulmonary function testing may then be necessary to determine if gas exchange abnormalities contribute to the severity of a respiratory impairment. Additional testing might include measurement of diffusing capacity of the lungs for carbon monoxide or resting arterial blood gases.

*Id*.

> D.   Eligibility for Child DIB and SSI.

Blake alleged disability beginning September 1, 1991 (Tr. 133). In order to be eligible for child DIB, Blake had to establish that he became disabled before the age of 22 (i.e., in or before early February 2004) (Tr. 133). *See* 20 C.F.R. § 404.350(a) (child DIB requirements).

The earliest month in which a claimant can receive SSI benefits is the month following the month in which his application was filed. *See* 20 C.F.R. § 416.335.  For purposes of SSI, the issue before the ALJ in this case was whether Plaintiff met the statutory requirements for disability between March 3, 2008 (the date of Plaintiff's application) and January 6, 2010 (the date of the ALJ decision).  *See* Doc. 21 at 3.

IV.     Relevant Facts.

    1.     Blake's vocational background.

Blake was born on February 3, 1982. (Tr. 34).  He was 26 years old on June 26, 2008, when the ALJ issued his unfavorable decision (Tr. 78, 83).  He left school in the 9th grade (Tr. 36), and last worked in 2003 as a "Painter's helper in the . . .shipyard" near Nashville, Tennessee.  (Tr. 37).  Blake testified that he only worked at that job for two weeks when he was hospitalized for "pneumonia pseudomonas" and "coughing up blood." (Tr. 37).   He then returned home.  (Tr. 37).

    2.     Medical Evidence.

In August 1989, Blake was diagnosed with cystic fibrosis.[9] On November 13, 1991, Lawrence Sindel, M.D., stated that cystic fibrosis affected both Plaintiff's respiratory and gastrointestinal systems, and that he was being treated with antibiotic medication and dietary supplements. (Tr. 289).  Dr. Sindel further stated that, as a chronic lifelong disease with no cure, it was expected that Blake would "have increased problems" as he matured.  (Tr. 289).[10]  On November 24, 1994, Dr. Sindel stated that, when he examined Blake on November 21, 1994, he reported no problems since his last visit nine months before and that he continued to use antibiotic medication and take his prescribed enzymes with meals.  (Tr. 773).  At that time, Dr. Sindel described Blake's

---

[9] Cystic fibrosis is a disease passed down through families that causes thick, sticky mucus to build up in the lungs, digestive tract, and other areas of the body. *See* Cystic fibrosis, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001167/ (last visited May 8, 2012).

[10] *See also* Dr. Sindel's letter dated January 26, 1993 ("[Blake] has cystic fibrosis [and] will require life-long intensive therapy for this medical condition."). (Tr. 290).

medical health as "quite good" and reported the following results of Blake's pulmonary

function tests:

> FVC. 2.84 (122% of predicted); $FEV_1$ 2.59 (132% of predicted); $FEF_{25-75\%}$, 3.71 liters per second (156% of predicted); expiratory test time, 5.54 seconds.

(Tr. 773).  On February 23,1995, Dr. Sindel noted that on February 20, 1995, Blake

presented with a complaint of "fatigue with dyspnea on exertion," "cramping-type

abdominal pain" and "loose stools."  (Tr. 772).  Dr. Sindel stated that there was "[n]o

specific etiology" for Blake's fatigue but that his pulmonary functions "continue to be

excellent:

> FVC. 2.9 (119% of predicted); $FEV_1$ 2.53 liters (122% of predicted); $FEF_{25-75\%}$, 3.26 liters per second (131% of predicted); $FET_{100}$ 6.97 seconds.

(Tr. 772).  On May 31, 1995, Dr. Sindel noted that on May 22, 1995, Blake again

presented with a complaint of "fatigue, very persistent since January" and involving

"daytime sleepiness."  (Tr. 771).  Blake also reported "some loose stools and abdominal

cramps." (Tr. 771).   Blake's pulmonary functions were reported to be:

| | | |
|---|---|---|
| FEC | 2.75 liters | 102% of predicted |
| $FEV_1$ | 2.43 liters | 107% of predicted |
| $FEF_{25-75\%}$ | 2.04 liters | 111% of predicted |
| $EXP_{time-test}$ | 2.27 seconds | |

(Tr. 771).  According to Dr. Sindel, these test results were "completely normal" and he

opined that "[t]here was nothing to indicate that [Blake] has had any deterioration in his

status since his last visit [on May 22, 1995]."  (Tr. 771).  Blake again presented to Dr.

Sindel on August 21, 1995, a gap of six months since his previous appointment.  (Tr.

769).  Although Blake reported no gastrointestinal problems and only "an occasional

cough," Dr. Sindel found that he "had a significant decline in his pulmonary functions with his first ever set of functions demonstrating airway obstruction." (Tr. 769). Dr. Sindel reported the following pulmonary function test results:

| | | |
|---|---|---|
| FEC | 2.63 liters | 98% of predicted |
| $FEV_1$ | 2.04 liters | 87% of predicted |
| $FEF_{25-75\%}$ | 1.75 liters | 65% of predicted |
| $EXP_{time-test}$ | 6.75 seconds | |

(Tr. 769). Dr. Sindel ordered a sputum culture, prescribed "ciprofloxacin," and declared an intent to initiate intravenous antibiotic therapy if Blake failed to respond completely to the oral antibiotic. (Tr. 769). Dr. Sindel saw Blake again on September 11, 1995, and reported that his "viral respiratory infection" was improving and that, although the pulmonary function tests "demonstrated mild small airway obstruction," the results were "significantly improved when compared with functions measured on 8/21/95." (Tr. 770). The pulmonary function test results were as follows:

> FVC. 2.78 liters (104% of predicted); $FEV_1$, 2.23 liters (95% of predicted); $FEF_{25-75\%}$, 2.05 liters per second (76% of predicted); expiratory test time, 6.82 seconds.

(Tr. 770). On August 26, 2000, Blake attempted to return to Dr. Sindel for the first time "in 4 or 5 y[ea]rs," because he had a "sore throat, runny nose [and] cough 24/7 – productive" and had apparently been exposed to a "friend [diagnosed with] pneumonia [and] bronchitis." (Tr. 639). The records indicate that Dr. Sindel could not see Blake and referred him to his "family MD" but noted that Blake went, instead, to the emergency room. (Tr. 639). On August 29, 2000, Blake was again referred to his "family MD" and not seen by Dr. Sindel. On August 31, 2000, Blake's sister phoned Dr. Sindel's office to

report that Blake was "streaking blood in sputum" but was told to have Blake himself

call.  (Tr. 639).  The office notes for August 31, 2000, indicate that Blake was given an

antibiotic (Ciprofloxin) "yesterday" and would be continued on oral antibiotics. (Tr. 639).

Blake sought treatment for cystic fibrosis and pancreatitis between January 2001

and February 2004 (when he turned 22).  On May 1, 2001, Blake presented to Dr. Sindel

with abdominal pain in the "epigastric area."  (Tr. 768).  Blake reported that this pain was

occurring every three or four months and typically lasted four days and then resolves.

(Tr. 768).  Dr. Sindel noted that Blake's cystic fibrosis was last evaluated in November,

presumably of 2000, but that such was not done for "many years" prior to November.

(Tr. 768).  Dr. Sindel further reported, as part of the patient's history, that Blake's

"pulmonary function studies are reportedly normal" and did not indicate that he was

referring to recent tests.   (Tr. 768).  Dr. Sindel diagnosed pancreatitis, advised Blake to

avoid fatty foods, and prescribed medication (Tr. 768).   Dr. Sindel ordered an abdominal

ultrasound which was performed on May 1, 2001, and was normal (Tr. 857).

On June 10, 2002, Blake went to the emergency room, where care providers

assessed him with chest pain secondary to substance abuse[11] and muscle strain, provided

him with prescription ibuprofen, and instructed him to discontinue his substance abuse

and consider substance abuse counseling (Tr. 698).  On June 14, 2002, Blake presented to

Dr. Sindel, who noted that Blake had been seen in the emergency room 4 days earlier

with chest pain in the left upper thorax and had been diagnosed to have an apical

---

[11] The care providers do not identify the substance they allege Blake abused. (Tr. 698).

pneumothorax (collapsed lung). (Tr. 636, 767).  Dr. Sindel further noted that Blake had a job painting Subway stores with latex and oil-based paint, smokes a pack of cigarettes a day and "sometimes smokes illicit substances ["marijuana"]." (Tr. 636, 767).  Dr. Sindel also noted that Blake experiences abdominal pain every five to six months which "[h]e suspects that it is pancreatitis [but] takes no therapy for this problem."  (Tr. 767).  Dr. Sindel reported that Blake's chest x-ray "showed an apical pneumothorax on the left [and] [s]mall blebs were noted in the lungs bilaterally."  (Tr. 767).  Dr. Sindel ordered blood work and prescribed antibiotics (Ciprio) and vitamin supplements on a regular basis. (Tr. 635).  Pulmonary function tests showed $FEV_1$ ranging from 4.27 (101% of predicted) to 4.33 (103% of predicted); $FEF_{25-75\%}$ ranging from 5.70 liters per second (124% of predicted) to 6.28 liters per second (136% of predicted); and $EXP_{time-test}$ ranging from 4.27 to 4.61 seconds.  (Tr. 853).

On June 28, 2002, Blake reported to Dr. Sindel that "he has no significant change in his respiratory status except that he no longer is having chest pain." (Tr. 766).  Dr. Sindel specifically noted that Blake had no additional symptoms related to the pneumothorax and that his pulmonary function tests "were not significantly different when compared with those of 6/14/02."  (Tr. 766).  Those test results showed $FEV_1$ ranging from 4.38 (104% of predicted) to 4.44 (105% of predicted); $FEF_{25-75\%}$ ranging from 5.53 liters per second (120% of predicted) to 6.82 liters per second (148% of predicted); and $EXP_{time-test}$ ranging from 4.27 to 5.43 seconds.  (Tr. 851).   Dr. Sindel also reported that Blake "has cut his smoking []to 5 cigarettes per day and is looking towards quitting entirely."  (Tr. 766).  Dr. Sindel recommended that he continue his efforts to quit

smoking, stay on his dietary supplements and take a trial course of "Ultrase 20 to

determine whether or not it will improve his gastrointestinal symptoms and weight gain."

(Tr. 766).

On October 14, 2002, Blake presented to Dr. Sindel with chest pain and shortness

of breath (dyspnea).  (Tr. 764).  Blake also complained about his daily coughing that

produced small amounts of yellow/green sputum, which occasionally contained blood.

(Tr. 764).  Blake further complained about "occasional abdominal pain and occasional

mid upper gastric pain" and Dr. Sindel noted that Blake "had mid upper gastric

tenderness" at the time of this examination.  (Tr. 764).  Dr. Sindel reported the following

pulmonary function test results:

| | | |
|---|---|---|
| FVC | 5.12 L | 100% |
| $FEV_1$ | 3.63 L | 109% |
| $FEF_{25-75\%}$ | 5.54 L/s | 114% |
| Exp. Test Time | 6.37 seconds | |

(Tr. 764).   Dr. Sindel opined that Blake's "significant chest pain and dyspnea" was

unlikely to be caused by his lung problems because the pulmonary functions were

"excellent" but were instead caused by gastroesophageal reflux for which "Zantac 150

mg. twice a day" was prescribed.  (Tr. 764).  On October 28, 2002, Blake presented to

Dr. Sindel with "difficulty breathing with exertion and exhaust quickly" as well as

"constant cough with sputum production [and] difficulty sleeping because of his cough."

(Tr. 763).  Blake denied any gastrointestinal problems but claimed that his energy level

was poor and much worse than in the past, limiting his activity level.  (Tr. 763).  Dr.

Sindel reported that the chest x-rays showed fibrocystic disease most concentrated in the

upper lobes bilaterally." (Tr. 763).   Dr. Sindel further reported that "[a]n exercise

challenge has been scheduled for Mr. Blake to look at the magnitude of his exercise

intolerance and search for an etiology." (Tr. 763).  The results of the exercise challenge

test conducted on November 5, 2002, were reported as follows:

> NORMAL SPIROMETRIC VALUES indicate the absence of any
> significant degree of obstructive pulmonary impairment and/or restrictive
> ventilator defect.  Bronchodilator therapy was administered followed by
> repeat spirometric testing.  Post-bronchodilator testing failed to
> demonstrate a significant change in FVC, FEV1, or FEF 25-75.  This
> indicates that this patient may not benefit from continued bronchodilator
> therapy.

(Tr. 846).   The specific changes reported pre- and post- bronchodilator included the

following, in pertinent part:[12]

|                 | Pre  | %Prd | Post | %Prd |
|-----------------|------|------|------|------|
| FVC  (L)        | 4.64 | 90%  | 4.48 | 87%  |
| FEV1 (L)        | 4.21 | 96%  | 4.13 | 95%  |
| FEF25-75% (L/s) | 5.38 | 111% | 5.32 | 110% |
| Exp time (s)    | 3.50 |      | 3.74 |      |

(Tr. 846-847).

On March 9, 2003, Blake was admitted to the hospital for a collapsed lung and had

a chest tube placement and partial lung resection surgery. (Tr. 295).  The pathology

report for excised lung tissue revealed acute and chronic bronchitis, bronchopneumonia,

thickening of the lining of the lungs (pleural thickening), and thickening of the tissue

around the air sacs in the lungs (focal interstitial fibrotic changes).  (Tr. 295).  The

---

[12] These results are chosen from the category designated as "Best" and appear to represent the best result among the "3" efforts performed for each test.  (Tr. 846-847).

attending physician reported that Blake was doing well following the surgery and was "stable" when discharged following removal of the chest tube on March 20, 2003. (Tr. 295). Blake was reported to be ambulating well with no shortness of breath. (Tr. 295).

Blake continued to receive treatment for cystic fibrosis after he turned 22 in February 2004. On March 16, 2004, he presented to the emergency room with chest pain and shortness of breath that he described as feeling like it did when he had the pneumothorax but not as severe. (Tr. 237). Chest x-rays showed hyperinflated lung fields and "nodular opacities in the upper lobes which raises concerns for possible tuberculosis exposure." (Tr. 338).

On May 18, 2004, Blake presented again to the emergency room with "pleuretic chest pain" said to be "gradually worsening" as well as a dry cough, exertional dyspnea, chills and fever. (Tr. 339). Blake received not only pain medication but Chest PT treatment, which he was directed to continue after discharge. (Tr. 339). He was also instructed to return to Dr. Sindel within the week. (Tr. 339). Chest X-rays taken at this time were said to be normal. (Tr. 340).

On July 12, 2004, Blake presented to the emergency room and reported chest pain described as sharp, stabbing pain. (Tr. 342). Care providers diagnosed him with inflammation of the lining of the pleural cavity surrounding his lungs (viral pleurisy). (Tr. 342). Blake was treated with antibiotic medication, narcotic pain medication, and an antihistamine. (Tr. 341). Chest x-rays revealed "subtle infiltrate within the right upper lobe just above the position of the medium fissure." (Tr. 819). Blake was subsequently discharged on antibiotics. (Tr. 342).

On July 23, 2004, Blake was hospitalized for five days due to hemoptysis[13]. (Tr.

367). A chest x-ray taken on his admission, revealed a "subtle increase in the interstitial

markings within the right upper lung fields previously documented 7/12/04." (Tr. 365,

818). Pulmonary function tests performed both pre- and post-dilator on July 26, 2004,

revealed, in pertinent part:

|  | Pre | %Prd | Post | % Change |
|---|---|---|---|---|
| FVC (L) | 4.49 | 89% | 3.69 | -18% |
| FEV1 (L) | 4.04 | 93% | 3.17 | -21% |
| FEF25-75% (L/s) | 4.62 | 95% | 3.47 | -25% |

(Tr. 363). Blake was diagnosed with bronchitis secondary to cystic fibrosis and treated

with antibiotics. (Tr. 366-367). Blake was discharged when the hemoptysis subsided.

(Tr. 367).

On August 7, 2004, Blake went to the emergency room because he was coughing

up blood (Tr. 381). On examination, he was determined not to be in respiratory distress

and had normal breath sounds. (Tr. 383). Care providers determined a primary diagnosis

of hemoptysis, a secondary diagnosis of pleurisy, and a tertiary diagnosis of cystic

fibrosis. (Tr. 388). Blake was given an antibiotic injection and narcotic pain medication,

and subsequently discharged with instructions to see Dr. Sindel within three days. (Tr.

387-388).

On August 12, 2004, Blake was evaluated at Mobile Mental Health for depression

and anxiety and complaints of lack of interest or motivation and no sleep. (Tr. 449). He

---

[13] Hemoptysis or haemoptysis is the expectoration (coughing up) of blood or of blood-stained sputum from the bronchi, larynx, trachea, or lungs.

told the examiner that he was unemployed and in the process of getting disability.  (Tr. 450).  Blake reported that he used to do construction work but "haven't been able to work – get short of breath."  (Tr. 450).  He also reported that he would dip snuff, have 7-8 beers over weekend but never during the week, and, before his "probation," smoked two marijuana joints per day "to calm my nerves."  (Tr. 449-50).

On October 13, 2004, Blake again went to the Mobile Infirmary Medical Center emergency room and reported chest wall pain and shortness of breath while working outside. (Tr. 402).  Care providers noted decreased breath sounds (Tr. 404) and opined that his chest pain was due to a problem in the chest wall (Tr. 408).  He was given a muscle relaxant and ultimately discharged home (Tr. 402-10).

On October 24, 2004, Blake returned to the Mobile Infirmary emergency room with "frank hemoptysis," cough, nausea and vomiting, trouble breathing, and chest tightness.  (Tr. 414).  He was treated with Levaquin, Phenergan, and Tylenol.  (Tr. 413, 415).  He was discharged home with a prescription for Xanax.  (Tr. 422).

From October 26 - 30, 2004, Blake was hospitalized for pseudomonas bronchitis, staph aureus bronchitis, hemoptysis, and cystic fibrosis. (Tr. 439-440).  Dr. Michael Hawthorne observed increased purulence of Blake's sputum, increased sputum amount with some hemoptysis.  (Tr. 751). Blake was placed on two IV antibiotics (Aztreonam and Cefepime), ordered to take "Pulmozyme nebulized" twice a day and to undergo chest percussive therapy, as well as physical therapy, daily.  (Tr. 752).   On October 26, 2004, Blake's pulmonary function tests revealed the following, in pertinent part:

| | | |
|---|---|---|
| FVC (L) | 4.77 | |
| $FEV_1$ (L) | 4.10 | |
| FEF $_{25\text{-}75\% (L/s)}$ | 4.61 | |

(Tr. 842).   Dr. Hawthorne stated that, in view of Blake's lack of insurance, an attempt would be made to "get Social Services involved to see if somehow we can get home antibiotics paid for [so that they could] place a PICC line and have him receive his antibiotics at home." (Tr. 752).  Blake was ultimately discharged on IV antibiotic therapy to be administered at home. (Tr. 753).

On November 8, 2004, Blake presented to Dr. Sindel for a follow-up visit at the conclusion of two weeks of IV antibiotics.  (Tr. 755).  Dr. Sindel noted that, although Blake had significant improvement  upon his initial treatment in the hospital, he continues to have some coughing, occasional sputum dyspnea and chest pain, and diarrhea, as well as occasional sputum production but no hemoptysis.  (Tr. 755). Pulmonary functions tests were performed and revealed the following, in pertinent part:

| | | |
|---|---|---|
| FVC | 4.8 L | 95% |
| $FEV_1$ | 4.34 L | 101% |
| FEF $_{25\text{-}75}$ | 6.21 L/s | 130% |
| Exp. Test Time | 4.97 seconds | |

(Tr. 755).  Dr. Sindel commented that "Blake's pulmonary functions have improved significantly and are now normal." (Tr. 755).  Consequently, Dr. Sindel recommended that Blake stop taking the IV antibiotics but continue to take his vitamins and return for reassessment in about three months.

On January 31, 2005, Blake reported two days of dyspnea (labored or difficult

breathing resulting in shortness of breath/air hunger), rhinorrhea (a runny nose), a sore

throat, and productive coughing.  (Tr. 750).  He reported that he experienced dyspnea

when involved in routine activity and even at rest.  He also reported that his energy level

was poor and his activities limited.  (Tr. 750).   On examination, his nose was clear and

he had good breath sounds. Pulmonary function tests were performed and produced the

following results:

| | | |
|---|---|---|
| FVC   (L) | 3.75 | 74% |
| FEV$_1$  (L) | 3.26 | 75% |
| FEF $_{25\text{-}75\%}$ (L/s) | 4.30 | 90% |
| Exp. Test Time | 4.18 seconds | |

(Tr. 840).   Dr. Sindel stated that, although Blake's "overall status appears relatively

stable," "[h]is lung functions have declined suggesting the possibility of restriction."  (Tr.

750).  Dr. Sindel prescribed a course of antibiotic medication (Tr. 750).

On March 28, 2005,  Blake reported abdominal pain that had been present for the

past day and advised that he had been taking his sister's prescription pain medication.

(Tr. 749).  He further reported shortness of breath when climbing stairs but not with

routine activity. (Tr. 749).  On examination, he had good breath sounds; pulmonary

function tests showed FEV1 levels of 3.68. Dr. Sindel noted that Blake's abdominal

symptoms could be related to pancreatic problems and prescribed narcotic pain

medication (Tr. 749, 838-39). Dr. Sindel recommended an evaluation of Blake's lipase

and amylase levels as well as an abdominal ultrasound.  (Tr. 749).  He also provided

Blake with "a couple of days of Lortab to help him with his discomfort."  (749).

The record indicates that Blake presented again to the emergency room on January

28, 2007, with complaints of chest pain similar to his past history of spontaneous

pneumothorax (Tr. 464).   Blake also complained of a sore throat and productive cough.

(Tr. 462).  Chest x-rays showed no acute cardiopulmonary disease. (Tr. 467).  Dr. Randy

Lockhart diagnosed sinusitis and discharged Blake with 20 antibiotic pills and

instructions to take the medication twice a day.  (Tr. 474).

In October 2007, Blake stated that his activities included performing his own self-

care, cooking and preparing meals, doing some housework and yard work, driving, and

loading and unloading items such as groceries from the car (Tr. 160-65; see also Tr. 200-

04 (March 2008 statement), 485 (admitting in November 2007 that he could drive, cook,

sweep, wash clothes, care for personal grooming and hygiene, manage personal finances,

and interact with friends and family), 548 (stating in May 2008 that he spent his days

doing laundry and helping his mother, and that he did light yard and housework)).

Blake's mother provided a similar statement, in which she also mentioned that Blake fed

and watered his dogs and ran errands (Tr. 166-73).

On October 29, 2007, Blake presented to Mark McCutcheon, M.D., for a physical

examination in relation to his claim for Social Security disability benefits. Dr.

McCutcheon summarized Blake's history as follows:

> CHIEF COMPLAINT:  Mr. Blake is a 25-year-old white male who was
> diagnosed at 8 years of age with cystic fibrosis.  He is being followed by
> Dr. Sindel.  He has recurrent problems with difficulty breathing.  He has
> also had secondary to cystic fibrosis several past surgical interventions for
> bowel blockages.  He has also had pseudomonas infections in the lungs.  In
> 2003, he had his right upper lobe removed after spontaneous
> pneumothorax.  He had a total of 4 of these over a 5- to 6-year time span
> before the lobectomy was performed.  The patient states that he cannot
> maintain any physical activity of any time duration due to getting shortness

of breath. The patient states Dr. Sindel said he had greater than 30+ blebs on both lungs. He has also had some problems with pancreatitis and arthritis secondary to cystic fibrosis. His last pulmonary function test was done 12 to 18 months ago at Dr. Sindel's office but that was not available, and he had one performed today in the office. Mr. Blake made it through the 9th grade. He can read and write. He currently lives with his mom. He has been doing general labor work since 2001. He has been doing odds-and-ends type jobs to get by for the past 1 ½ to 2 years, but his lung function is steadily getting worse. He does not smoke, do drugs, or drink. He did lose his sister this past year due to cystic fibrosis and has an extremely strong family history of cystic fibrosis.

(Tr. 480). Blake told Dr. McCutcheon that he could "lift about 25 pounds but [could] not go very far with it." He was not currently taking any medication. On examination, Dr. McCutcheon found Blake had clear but "very diminished [breath sounds] bilaterally" and was "mildly short of breath during the examination." (Tr. 480, 481). Dr. McCutcheon diagnosed Blake with: 1) Cystic Fibrosis; 2) recurrent shortness of breath with activity; 3) history of right upper lobectomy; and 4) recurrent pancreatitis/arthritis/bowel blockages secondary to cystic fibrosis. (Tr. 481). Dr. McCutcheon stated that "I do not understand why [Blake] could not possibly perform a seated job such as answering the phone or general secretarial type work, but the problem with that is his decreased education level." (Tr. 481). Dr. McCutcheon noted that "Cystic Fibrosis is a deteriorating condition but can usually be controlled and quality of life can be lengthened with the use of proper medications." (Tr. 481).

On November 27, 2007, the Agency sent Blake for pulmonary function testing. The test results revealed an FVC level of 3.96 L (97% of predicted) and an $FEV_1$ level of 3.59 L (104% of predicted). (Tr. 491).

On March 29, 2008, Blake went to the emergency room for chest pain. He

reported that when he got out of bed and took a deep breath, he felt a pop followed by a sharp pain and shortness of breath similar to his previous pneumothorax. (Tr. 535). On examination, he was found to have decreased breath sounds but clear in the left lung and was sent for a chest CT scan.  (Tr. 536). Care providers found no evidence of an infection, prescribed non-steroidal anti-inflammatory medication, and instructed Blake to follow up with a regular doctor or Stanton Road Clinic and to return to the emergency room if he had a productive cough, a change in condition, or worsening symptoms (Tr. 535-41).

On May 13, 2008, Blake presented to Dixie Kidd, D.O.[14], for a consultative physical examination in relation to his Social Security claim. Blake said that he did not have many problems with cystic fibrosis as a child, but "as he was growing up, he's had more and more problems," including shortness of breath, chest pain, and coughing.  (Tr. 551).  On examination, he had "decreased breath sounds throughout especially in the right upper lobe" but no rales, rhonchi, or wheezes.  (Tr. 551). Dr. Kidd observed that Blake "appears OK when he's sitting still but more than likely if he tries to do any kind of work at all, he'd get short of breath." (Tr. 552).

On June 24, 2008, the Agency sent Blake for additional pulmonary function testing.  The test results revealed an FVC level of 4.70 L (98% of predicted) and an $FEV_1$ level of 3.94 L (98% of predicted).  (Tr. 583).

On August 23, 2008, Blake was again admitted to the emergency room for

---

[14] Dr. Kidd is identified as a Doctor of Osteopathic Medicine ("D.O."), which is an alternative degree to an M.D. degree in the United States.

shortness of breath that began in the morning and worsened during the day.  (Tr. 595).

He also complained of increased nonproductive coughing.  (Tr. 600).  Blake reported that

he was not taking medication and had not seen Dr. Sindel in at least two years.  (Tr. 600).

A chest x-ray showed no evidence of pneumothorax. Care providers diagnosed cystic

fibrosis exacerbation, treated him with a bronchodilator, non-steroidal anti-inflammatory

medication, and morphine, and instructed him on discharge to follow up at Stanton Road

Clinic (Tr. 595-610).

Blake did not present to Stanton Road Clinic until November 5,  2008, when he

reported shortness of breath, chest pain, and a "mostly dry" cough, and admitted that he

was not taking any medication (Tr. 618).  Although the medical notes are difficult to

decipher, it appears that Blake was diagnosed with "flu 2 months" and given a "flushot."

(Tr. 618).

Blake returned to Stanton Road Clinic on February 4, 2009, with chest pain,

difficulty sleeping, coughing with little sputum production, and wrist pain for which he

was referred to orthopedics.  (Tr. 617).    On February 9, 2009, Blake was seen by Dr.

Frederick N. Meyer for treatment of a fractured wrist. (Tr. 614-616).  Blake presented

again to Stanton Road Clinic on February 11, 2009, complaining of anxiety and difficulty

sleeping (Tr. 612-613).  Prescriptions for Prozac and Ambien were given and Blake was

referred back to Mobile Mental Health.  (Tr. 613).

On May 6, 2009, a doctor at Stanton Road Clinic completed a check-the-box style

form titled "Assessment To Do Work-Related Activities," opining that Blake had "No

impairment" in any of the activities identified on the checklist, such as "activities of daily

living or "social functioning."  (Tr. 625).

        3.     <u>Blake's Testimony</u>.

At an administrative hearing held on December 14, 2009, Blake testified he had not worked since 2003 (when he was employed as a painter's helper in a shipyard) and that he lived on his wife's food stamps and child support checks (Tr. 37-38). Blake asserted that he was unable to work due to "being . . . in and out of the hospital all the time" (Tr. 40). Blake testified concerning his approximately two week hospitalization and lung surgery in 2004 (Tr. 41-42).  Although he could not recall the dates, Blake also testified to a second hospitalization for "about a week" and several emergency room visits. (Tr. 41-43).

Blake stated that, although the doctors had prescribed several medications, he was unable to afford them. (Tr. 49)  He noted that, from time to time he uses an inhaler, Albuterol, but the one he had at the time of the hearing had expired in October. (Tr. 49-50).  Blake also testified that he was taking Paxil for his "chemical imbalance," anxiety and sleeping problems (Tr. 44) but only had a few left from those his mother helped him get. (Tr. 49).

Blake further testified that his activities are limited because "I get short winded easily" and, if he tries to do anything stressful, "I get the tightness in my chest."  (Tr. 45). He explained that :

> [S]ay, if I try to get out in the yard and pick up, or do something like that
> for a little while, within five minutes or so I'm having to sit back down,
> catch my breath, then wait another 10, 15 minutes or so and try to pick
> myself up, basically push myself to do things.

(Tr. 45).  Blake testified that he was "basically a homebody" and, "[i]f I go anywhere, I go two miles up the road and go visit with my mama a little bit, and then just come back to the house."  (Tr. 47).  Blake noted that he does drive but most of the time lets his wife drive. (Tr. 46). Blake admitted that he has not looked for work because "I try to get out and do, and I just, I can't" and because, if "I push myself too hard, . . . I end up back into the emergency room again." (Tr. 47).

### 4.    Vocational Expert's Testimony.

Doug Miller, the Vocational Expert (VE) testified that the following jobs were available to Blake: 1) "poultry eviscerator, working on a line";[15] 2) "cafeteria attendant" with a DOT code 311.677-014, classified as light, unskilled, with SVP level of two and listed nationally at 102,000 jobs;  3)  "microfilm document preparer" with a DOT code 249.587-018, classified as sedentary and listed nationally at 148,000 jobs;  4) "surveillance monitor" with a DOT code 379.367-010, classified as sedentary, unskilled, and listed nationally at 102,000 jobs;  and 5) "information clerk" with a DOT code 237.367-018, classified as sedentary, semiskilled, with SVP level of three and listed nationally at 115,000 jobs.  (Tr. 56-58).  Blake presents no challenge to either the ALJ's hypothetical or the VE's testimony.

### 5.    ALJ's Decision.

The ALJ found at step two that Blake's cystic fibrosis and history of pancreatitis were severe impairments, but determined at step three that Plaintiff had not met his

---

[15] This job was essentially rejected by the ALJ because of the odor. (Tr. 56-57). The ALJ immediately asked "[i]s it clean?" and commented "smells bad – wouldn't it?"  (Tr. 56).

burden to show that his impairments or combination of impairments "meets or medically

equals one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1." (Tr. 22,

Finding 4). The ALJ specifically declared that he relied solely on his determination that

"based on the totality of the medical and nonmedical evidence or record, the claimant's

impairments do not meet or medically equal the criteria of Listings 4.00 and 5.00." (Tr.

23, Finding 4).

   The ALJ further concluded that "the claimant has the residual functional capacity

to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and

416.967(b), in function by function terms (SSRs 83-10 and 06-8p), with certain

nonexertional restrictions associated with that level of exertion [and] claimant's specific

physical capabilities during the period of adjudication have been the ability to work in an

environment that does not require even moderate exposure to dust, fumes, odors, gases,

etc." (Tr. 23, Finding 5). The ALJ predicated his conclusion on the following, in

pertinent part:

> The claimant said he cannot work due to being in and out of the hospital so
> much. When asked specifically about hospital visits, the claimant said he
> went to the emergency room about a month and half ago, but was sent
> home because his lungs "looked good." The claimant said he has been to
> the emergency room several times due to chest pains and was also sent
> home. The claimant said the last time he was in the hospital for treatment
> was for lung surgery in 2004. He said he was also in Mobile Infirmary
> about 2 years ago for pneumonia. He is currently treated at the Stanton
> Road clinic and has been going there for the past year.
>
> • • •
>
> In terms of claimant's alleged cystic fibrosis, the last time he was actually
> hospitalized was in 2004 for his lung surgery. The claimant has not
> generally received the type of medical treatment one would expect for a

totally disabled individual.  Although the claimant has received treatment for the allegedly disabling impairment, that treatment has been essentially routine and/or conservative in nature.  The claimant did undergo surgery for the alleged impairment in 2004, which certainly suggests that the symptoms were genuine.  While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms.  Despite the complaints of allegedly disabling symptoms, there have been significant periods of time since the alleged onset date during which the claimant has not taken any medication for those symptoms.

The medical records indicate that he was hospitalized three times between March, 2003 and October, 2004. The Claimant was treated from March 9-20, 2003, at USA Medical Center for spontaneous pneumothorax and had a chest tube placement . . . was scheduled for video assisted Thoracoscopy with mechanic pleurodesis, which was done without complication. The pathology report of excised lung tissue revealed acute and chronic bronchitis, bronchopneumonia, focal interstitial fibrotic changes, and pleural thickening.  After this surgery, the claimant did well with no air leaks.  The chest tube was removed on March 20, 2003, and the claimant was ambulating well with no shortness of breath.  (Exhibit D3F).  The claimant was later admitted from July 23-29, 2004, for treatment of hemoptysis secondary to cystic fibrosis.  The claimant was placed on Ciprofloxacin, and eventually his hemoptysis subsided.  (Exhibit D8F).  Finally, the claimant was hospitalized at Mobile Infirmary Medical Center from October 26-30, 2004, for pseudomonas bronchitis, staph aureus bronchitis, hemoptysis, and cystic fibrosis. . . . The claimant was started on Aztreonam and Tobramycin, and his symptoms resolved.  The claimant also reported that his dyspnea and malaise had improved. (Exhibit D12F).

● ● ●

The claimant testified that he is in and out of the hospital; yet, as noted above, he is typically treated and released.  The record contains seven emergency room visits in which the claimant was released after improvement with treatment.  [The ALJ summarizes Blake's emergency room visits on July 12, 2004, August 7, 2004, October 13, 2004, October 24, 2004, January 28, 2007, March 29, 2008 and August 23, 2008.].

(Tr. 23-26).  The ALJ also addressed the reports of two consultative physical

examinations.  In the first, conducted by Dr. Mark McCutcheon on October 29, 2007, the

ALJ noted that "[d]uring the review of systems, the claimant was positive for shortness of breath with activity and pleurisy." (Tr. 26, referring to Tr. 480). The ALJ further noted that:

> During the physical examination, Dr. McCutcheon noted that the claimant's lungs were very diminished bilaterally, but clear. . . . Dr. McCutcheon diagnosed the claimant with cystic fibrosis, recurrent shortness of breath with activity, history of right upper lobectomy, and recurrent pancreatic/arthritis/bowel blockages secondary to cystic fibrosis. . . . He did get mildly short of breath during the examination.

(Tr. 26, referring to Tr. 480-481). The ALJ nonetheless discounted Dr. McCutcheon's opinion that "[a]t this time, I am unsure of where Mr. Blake would be properly placed in the workforce," on the grounds that this opinion was based solely on Dr. McCutcheon's reference to Blake's "9th grade education" and the jobs identified by the vocational expert who is said to have taken "claimant's limited educational background" into consideration. (Tr. 27, referring to Tr. 481 as well as Tr. 56-60).

In the second consultative examination performed by Dixie Kidd, DO, on May 13, 2008, the ALJ acknowledged that Dr. Kidd reported that, "[d]uring the physical examination, the claimant had decreased breath sounds throughout, especially in the right upper lobe"; that "claimant has cystic fibrosis, frequent pneumothoraces, and frequent pancreatitis"; and that "claimant appears 'okay' when he's sitting still; but more than likely if he tried to do any kind of work at all, he would get short of breath." (Tr. 26-27, referring to Tr. 551-552). The ALJ, however, discounted Dr. Kidd's opinion that any work activity would result in shortness of breath on the grounds that:

> The opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming the opinion. Dr. Kidd's physical

examination does not support such a finding, and it is inconsistent with his treatment history.

(Tr. 27).

V.   <u>Analysis</u>.

**The ALJ did not err by failing to conclude that Blake was disabled under Listing 3.04**.

The Listing at issue in this case is 3.04 for cystic fibrosis.  It is important to note that "[t]he Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard."  <u>Sullivan v. Zebley</u>, 494 U.S. 521, 532 (1990).  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity'." *Id., citing* 20 CFR § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity"); SSR 83-19, at 90 (listings define "medical conditions which ordinarily prevent an individual from engaging in any gainful activity").  The distinction is made between the Listing's level of severity and the statutory standard because "the Listings were "designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id.*; *see also* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987)(if an adult's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step.").  Each impairment categorized in the Listings at 20 C.F.R. pt. 404, subpt. P, app. 1, is defined in terms of several specific medical signs, symptoms, or laboratory test results.  <u>Zebley</u>, 493 U.S at 530.  "For a

31

claimant to show that his impairment matches a listing, it must meet *all* of the specified

medical criteria [and] [a]n impairment that manifests only some of those criteria, no

matter how severely, does not qualify."  *Id*.

Blake argues that the ALJ erred when he failed to properly evaluate his cystic

fibrosis and associated impairments.  According to Blake, "[t]he pulmonary

manifestations of cystic fibrosis should be evaluated under 3.04 of the Listings of

Impairments" and, in this case, "[t]he ALJ/Commissioner . . . evaluated [plaintiff's] cystic

fibrosis under 4.0 and 5.0 of the Listings which disregarded the plaintiff's respiratory

problems."  (Doc. 19 at 4).  Blake further contends that the ALJ erred because only the

"non-pulmonary aspects of cystic fibrosis should be evaluated under the digestive body

system [analysis discussed in] 5.00 of the Listings of Impairments."  (Doc. 19 at  4).

Blake argues that he "should be awarded benefits in accordance with 3.04 of the Listing

of Impairments without further delay."  (Doc. 19 at 5).

Similarly, to the extent Blake contends that the ALJ did not consider the combined

effects of his impairments, the undersigned agrees with the Commissioner that the ALJ's

conclusion that Blake's impairments "did not meet or medically equal any of the

listings," "was sufficient articulation of the ALJ's step three finding."  (Doc. 21 at 14).

*See* Gray ex rel. Whymss v. Comm'r of Soc. Sec., 454 F. App'x 748, 750 (11th Cir. 2011)

("Although the ALJ did not explicitly cite Listing 112.05D, he found that [the claimant]

did not meet one of the Listings, and he properly cited the three-step process."), *citing*

Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986)).  It is Blake who failed to

meet his burden to prove that his impairments met or medically equaled the requirements

of Listing 3.04 inasmuch as:

> Even when Plaintiff's symptoms were exacerbated, pulmonary function tests were well above 1.95 (Tr. 363, 491-92, 583-84, 755, 764-65, 838-41, 846-48, 851-54). The record does not show episodes of bronchitis or pneumonia with hemoptysis or respiratory failure occurring at least once every two months or at least six times a year within a continuous 12 month period. Nor does the record show persistent pulmonary infection accompanied by superimposed, recurrent symptomatic episodes of increased bacterial infection occurring at least once every six months and requiring intravenous or nebulization antimicrobial therapy.

(Doc. 21 at 12-13).    According to Blake, "the ALJ relied only upon the Listings of 4.0 and 5.0 in his decision making process."  (Doc. 19 at 5, *citing* Tr. 22-23).  However, Blake asserts no specific error by the ALJ in connection with his conclusion that Blake did not satisfy Listings 4.0 and 5.0.  Consequently, Blake's sole contention is that he is disabled because he satisfies Listing 3.04, a contention which is not supported by the record.

To the extent that Blake argues that the ALJ should have found that he met Listing 3.04 on July 26, 2011, when his pulmonary function test result revealed an $FEV_1$ of 1.30 Liters (Doc. 19 at 5, *citing* Tr. 286), it is clear that this evidence was never presented to the ALJ and has no bearing on whether Blake satisfied the Listing 3.04 criteria on or before the date of the ALJ's January 2010 decision. *See* Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) (recognizing that courts "review the decision of the ALJ as to whether the claimant was entitled to benefits during a specific time period, which period was necessarily prior to the date of the ALJ's decision," and holding that, while evidence regarding a claimant's condition after the ALJ's decision "may be relevant to whether a deterioration in [the claimant's] condition subsequently entitled her to benefits, it is simply not probative of any issue in this case").  Blake points to no other evidence in the record that supports his contention that he satisfied Listing 3.04 prior to the ALJ's

January 2010 decision.[16]  Consequently, the ALJ did not err in this manner and his

decision must, therefore, be affirmed.

CONCLUSION

For the reasons stated above, it is **ORDERED** that the decision of the

Commissioner of Social Security denying plaintiff's benefits be and is hereby

**AFFIRMED**.

**DONE** this  3rd   day of December, 2012.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[16] In his "Post Hearing Brief" (doc. 28), Blake argues that the letter written by Dr. Tung Tran on (Tr. 285) on May 5, 2009, should have been considered by the Appeals Council and should be considered by this Court because it was available to the ALJ and omitted only due to "a clerical error."  (Doc. 28 at 4).   There is nothing, however, in Dr. Tran's letter that would support a contention that Blake satisfied Listing 3.04.  Dr. Tran states that, based on his treatment of Blake since February 2009, Blake "is currently managed on multiple medications." (Tr. 285).  Although Dr. Tran opines that Blake "will have continued CF exacerbations throughout his lifetime that ***may*** be completely disabling and limit his ability to perform ***physically demanding activities,***" he clearly states that "[Blake] is currently stable." (Tr. 285, emphasis added).